UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**DANIEL GATTI,**                                                                  **Plaintiff**

**v.**                                                  **Case No. 3:15-cv-555-CHL**

**COMMISSIONER OF SOCIAL SECURITY,**                   **Defendant**

## Memorandum Opinion and Order

### Introduction

Daniel Gatti moves for summary judgment. (DN 12.) Gatti challenges the Commissioner's denial of his disability insurance benefits claim. (DN 1 at ¶ 13.)

The parties consented to magistrate judge jurisdiction over this matter, including entry of judgment. (DN 10.)

For the reasons below, the Court will **deny** Gatti's motion for summary judgment. The Court will **affirm** the Commissioner's decision and **dismiss** this case, **with prejudice**.

### Background

For clarity, the Court cites to the document number and Page ID number.

On August 5, 2011, Gatti filed a claim for disability insurance benefits. (DN 9-3 at 134.) He alleged disability beginning on January 24, 2011. (*Id.* at 120, 135.) The Commissioner denied Gatti's initial application and request for reconsideration. (*Id.* at 133, 149.)

On April 16, 2013, Gatti, represented by counsel, appeared at a hearing in front of Administrative Law Judge Arline Colon (the "ALJ"). (DN 9-2 at 64, 118.) Gatti testified. (*Id.* at 89 – 107.) Scott Brown, a vocational expert, also testified. (*Id.* at 107 – 118.) The ALJ issued a written opinion finding that Gatti is not disabled. (*Id.* at 78.)

First, the ALJ found that Gatti met the insured status requirements of the Social Security Act. (*Id.* at 66.) Second, the ALJ found that Gatti has not engaged in substantial gainful activity since January 24, 2011. (*Id.*) Third, the ALJ found that Gatti "has the following severe impairments: tendonitis of hips; arthropathy of pelvis, femur, and hip; spondylosis of lumbar spine; restless leg syndrome; persistent insomnia; carpal tunnel syndrome and trigger finger; history of rotator cuff repair; and gastroesophageal reflux disease (GERD) (20 CFR 404.1520(c))." (*Id.*)

Fourth, the ALJ found that Gatti does not have an impairment or combination of impairments that meets or equals the severity of a listed impairment. (*Id.* at 72.) Fifth, the ALJ found that Gatti:

> has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except that he requires the flexibility to alternate between sitting for 15 minutes at a time and standing for 30 minutes at a time; he is limited to frequent climbing, balancing, stooping, kneeling, crouching, and crawling; occasional overhead reaching; frequent handling and fingering; and should avoid even moderate exposure to moving, mechanical parts and height.

(*Id.* at 73.) Sixth, the ALJ found that Gatti "is capable of performing past relevant work as a consultant, real estate sales agent, membership solicitor, and fast food services manager." (*Id.* at 78.) Seventh, the ALJ found that Gatti was not disabled. (*Id.*)

The Appeals Council denied Gatti's request for review. (*Id.* at 45 – 48.) After that final decision, Gatti filed this lawsuit. (DN 1.)

## Standard of Review

The Commissioner's factual findings are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). The Court should affirm the Commissioner's conclusion unless the ALJ failed to apply the correct legal standard or made fact findings unsupported by substantial record evidence. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). "Substantial evidence

2

is such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The Court does not resolve conflicting evidence or examine the claimant's credibility. *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).

## Discussion

The Commissioner evaluates whether a claimant is disabled through a sequential five-step process. 20 C.F.R. § 404.1520(a)(1); *Sullivan v. Finkelstein*, 496 U.S. 617, 620 (1990). Steps four and five are at issue in this case.

At step four, the ALJ considers the claimant's residual functional capacity and past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Residual functional capacity is the claimant's "remaining capacity for work once her limitations have been taken into account." *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 632 (6th Cir. 2004) (internal quotation marks omitted).

At step five, the ALJ assesses the claimant's residual functional capacity along with age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). A claimant who cannot make an adjustment to other work is disabled. *Id.* § 404.1520(g)(1). "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that you are disabled." 20 C.F.R. § 404.1527(d)(1) (brackets added).[1]

The Commissioner gives a treating source's opinion controlling weight if the treating source's opinion on the nature and severity of the impairment is "well-supported" by the medical evidence and is "not inconsistent" with the other evidence. 20 C.F.R. § 404.1527(c)(2). Otherwise, the Commissioner weighs a treating source opinion "based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by

---

[1] New regulations for evaluating medical opinions for claims filed on or after March 27, 2017 take effect on March 27, 2017. 20 C.F.R. § 404.1520(c).

relevant evidence." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2) – (6)) (internal citation omitted).

When substantial evidence supports an ALJ's evaluation of a claimant's credibility, the Court must accord great weight and deference to that credibility finding. *Walters v. Comm'r. of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Indeed, the court of appeals has said that an ALJ's "credibility findings are virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F.App'x 508, 511 (6th Cir. 2013) (internal quotation marks omitted).

## Analysis

**I.     Whether substantial evidence supports the ALJ's weighing of the medical evidence**

Gatti argues that the ALJ failed to properly weigh the medical evidence. (DN 13 at 20 – 4.) Specifically, the ALJ erred in not giving controlling weight to the opinions of Gatti's treating physicians: Dr. Steven Scheer and Dr. Emiliana Cruz-Hillis. (*Id.* at 23 – 4.) Even if their opinions were not entitled to controlling weight, the ALJ should have deferred to their opinions. (*Id.* at 24.)

### A.  Dr. Scheer's opinion

Dr. Scheer is Gatti's sleep specialist. In a letter dated October 5, 2012, Dr. Scheer wrote:

> I have been involved in the care of Mr. Daniel Gatti. He is difficult to manage because he has a combination of chronic pain syndrome from fibromyalgia, excessive sleepiness and insomnia, restless legs syndrome, REM behavior disorder causing very active and bizarre dreams, and severe anxiety and depression. His life is very compromised by his combination of conditions and it is my opinion that he is disabled and cannot perform work because of his sleep impairment, daytime sleepiness that prevents him from being safe to drive at times, and anxious depression.

(DN 9-7 at 764.)

Here, the ALJ did not give Dr. Scheer's opinion controlling weight. (DN 9-2 at 76.) The ALJ first noted that Dr. Scheer's opinion that Gatti is disabled is a legal conclusion that is

nonbinding on the Commissioner. (*Id.*) Then, the ALJ said, "Dr. Scheer's diagnosis of fibromyalgia is not supported by the evidence." (*Id.*) The ALJ also noted that Dr. Scheer's "treatment notes indicate that the claimant's sleep is fair on his medication regime, and that he gets five to six hours of sleep per night." (*Id.*)

Substantial evidence supports the ALJ's decision to not give Dr. Scheer's opinion controlling weight. The ALJ found that "Dr. Scheer's diagnosis of fibromyalgia is not supported by the evidence." (*Id.*) Gatti has not objected to this finding. At the hearing, when asked about how fibromyalgia affected his ability to work, Gatti testified, "Well, I don't know if I really have fibromyalgia." (*Id.* at 104.) Additionally, Dr. Cruz-Hillis, Gatti's primary care physician, made no mention of a fibromyalgia diagnosis in notes from Gatti's April 20, 2011, July 26, 2011 or August 22, 2011 office visits. (DN 9-7 at 476 –78; 479 – 81; 482 – 84.)

Beyond Dr. Scheer's fibromyalgia diagnosis, Dr. Scheer's October 5, 2012 opinion was inconsistent with Dr. Scheer's other letters in the record indicating that Gatti was getting quality sleep. Specifically, in a letter dated July 9, 2010, Dr. Scheer wrote that Gatti "seems to have diminished restlessness and gets between 7 and 8 hours of sleep each night." (*Id.* at 548.) Five months later, in a letter dated November 5, 2010, Dr. Scheer wrote that Gatti was getting five to six hours of sleep a night, and "The quality of his sleep is fairly good and he feels wakeful during the day." (*Id.* at 550.) And, in a letter dated January 13, 2011, Dr. Scheer wrote that Gatti "is most happy that both his daytime wakefulness and his nighttime sleep are as good as they have been in many years." (*Id.* at 551.) Dr. Scheer signed the January 13, 2011 letter less than two weeks before Gatti's alleged disability onset date of January 24, 2011.

Moreover, substantial evidence supports the ALJ's decision to give Dr. Scheer's opinion little weight. On September 1, 2011, Dr. Scheer completed a "Sleep Disorders Impairment

5

Questionnaire" provided by Gatti's attorneys.  (*Id.* at 530 – 34.)  In that form questionnaire, Dr. Scheer noted that Gatti has "serious limitations" in "maintaining attention for two hour segments" and is incapable of tolerating "low stress."  (*Id.* at 533.)  Less than two months after filling out the form questionnaire, and ten months after Gatti's alleged disability onset date of January 2011, Dr. Scheer wrote, "Sleeps about 6-7 hrs now on his regimen.  Feels reasonably happy about this."  (DN 9-7 at 455.)  In sum, substantial evidence supports the ALJ's decision to give little weight to Dr. Scheer's opinion because his answers on the form questionnaire were inconsistent with his other statements.

Therefore, substantial evidence supports the ALJ's decision to give little weight to Dr. Scheer's opinion.

### B.  Dr. Cruz-Hillis's opinion

Dr. Cruz-Hillis is Gatti's primary care physician.  In a letter dated October 5, 2011, Cruz-Hillis wrote:

> Mr. Gatti is a 56 year old gentleman I started seeing [in] November 2007.  His diagnoses were GERD with gastroparesis, sleep disturbance, restless leg syndrome, [hyperlipidemia], hypogonadism and rhinitis.  At that time he was under the care of pain management for degenerative disc disease and lumbar spine [stenosis].  Eventually he decided to get pharmacotherapy from us.  He had been maintained on opiates for pain control.  He [has persistent] pain and discomfort despite treatment and also drug induced fatigue exacerbating his other symptoms.  It had been recommended in the past that he see pain management again for further management.  He had tried working but [was] unable to keep the job.  He had anxiety and depression and was on anti-depressants.  [Emotional] symptoms have now improved[,] and he is off anti-depressants.
>
> Because of his persistent symptoms, [i.e.] back pain, shoulder pain, leg pain, abdominal discomfort and side effects of his medications, he is unable to perform work that entails prolonged sitting, standing or walking, concentration and focusing.

(DN 9-7 at 621 (brackets added); *see also*, *id.* at 753 ("Mr. Gatti has hypertension, GERD, gastroparesis, restless leg syndrome, depression with anxiety, hypogonadism, lumber spine

6

degenerative disc disease and stenosis.  He has been unable to work since 2010.'"))  Dr. Cruz-Hillis opined that Gatti could only sit for one hour in an eight-hour day, could only stand or walk for one hour in an eight-hour day, would need to get up and move around every thirty minutes, and would need to wait thirty minutes before sitting down again.  (*Id.* at 747.)

Here, the ALJ did not give Dr. Cruz-Hillis's opinion controlling weight.  (DN 9-2 at 77.)  The ALJ first noted that whether Gatti is unable to work is for the Commissioner to determine.  (*Id.*)  As for Gatti's physical limitations, the ALJ noted that Dr. Cruz-Hillis's opinion that Gatti "must move around every 30 minutes, and has minimal limitations in reaching, handling and fingering are not inconsistent with the claimant's residual functional capacity."  (*Id.*)  Then, the ALJ noted that Dr. Cruz-Hillis's opinion that Gatti "was unable to perform work that entailed prolonged concentrating or focusing is inconsistent with her prior opinion that the claimant's concentration was good."  (*Id.*)  Finally, "her opinion that he is only able to sit for one hour in an eight-hour day and stand and/or walk one hour in an eight hour day is not supported by the evidence."  (*Id.*)

Substantial evidence supports the ALJ's decision to not give Dr. Cruz-Hillis's opinion controlling weight.  Unlike Dr. Scheer's opinion, the ALJ did not make a finding that Dr. Cruz-Hillis's opinion was not supported by the evidence.  Still, for Dr. Cruz-Hillis's opinion to have controlling weight, Gatti must also show that Dr. Cruz-Hillis's opinion was not inconsistent with the other evidence.  20 C.F.R. § 404.1527(c)(2).

Dr. Cruz-Hillis's October 5, 2011 opinion was inconsistent with Dr. Cruz-Hillis's previous findings in the record indicating that Gatti had normal mood and affect and good concentration.  About six weeks before that October 5, 2011 opinion, Dr. Cruz-Hillis wrote a letter listing Gatti's physical limitations in concluding that Gatti has been unable to work since

7

2010, but that letter makes no mention any difficulty Gatti had in concentrating. (DN 9-7 at 752.) About three weeks before the October 5, 2011 opinion, Dr. Cruz-Hillis filled out a treating source mental status report that said Gatti had normal mood and affect and good concentration. (*Id.* at 562.) At that time, Dr. Cruz-Hillis noted that Gatti was "off any anti-depressants" and opined that Gatti was "stable." (*Id.* at 561.)

Moreover, substantial evidence supports the ALJ's decision to give Dr. Cruz-Hillis's opinion little weight. On October 4, 2011, Dr. Cruz-Hillis completed a "Multiple Impairment Questionnaire" provided by Gatti's attorneys. (DN 9-7 at 745 – 52.) In that form questionnaire, Dr. Cruz-Hillis noted that Gatti's "experience of pain, fatigue, or other symptoms" was severe enough to "constantly" interfere with attention and concentration. (*Id.* at 750.) Dr. Cruz-Hillis completed this form questionnaire less than three weeks after noting that Gatti had normal mood and affect and good concentration. (*See id.* at 562.) Altogether, substantial evidence supports the ALJ's decision to give little weight to Dr. Cruz-Hillis's opinion because her answers on the form questionnaire were inconsistent with her previous statements.

Therefore, substantial evidence supports the ALJ's decision to give little weight to Dr. Cruz-Hillis's opinion.

## II.   Whether substantial evidence supports the ALJ's finding as to Gatti's credibility

The ALJ found that Gatti's "statements concerning the intensity, persistence and limiting effects of these symptoms" were not entirely credible. (DN 9-2 at 73.)

Gatti argues that the ALJ failed to properly evaluate his credibility. (DN 13 at 1186.) First, Gatti argues that being able to perform sporadic household activities does not equate with an ability to work forty hours per week. (*Id.* at 1187.) Second, Gatti argues that the ALJ

8

impermissibly weighed the fact that he ran four miles three months prior to his alleged disability onset date. (*Id.* at 1188.)

Substantial evidence supports the ALJ's conclusion that Gatti's testimony about the severity of his symptoms was not entirely credible. Gatti testified that on a typical day, he goes outside, visits his parents after lunch, goes home, watches the news, has dinner at home, and goes to sleep around 9:00. (DN 9-2 at 105.) He also testified that he goes shopping ten times a month, though he stays in the store for only ten minutes. (*Id.*) He drives to his parents' house, to the car wash, and to look at cars. (*Id.* at 106.) As the ALJ noted, these activities are "inconsistent with an allegation that his pain is as persistent and unremitting as to preclude all work activity." (*Id.* at 74.)

Gatti's reliance on *Rogers* is misplaced. (*See* DN 13 at 1187 – 88 (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 – 49 (6th Cir. 2007)).) *Rogers* does emphasize how an ALJ must sufficiently detail a decision to discount a claimant's complaints of fibromyalgia pain. *See* 486 F.3d at 248. Here, the ALJ did not err in discounting Gatti's fibromyalgia diagnosis because Gatti testified, "Well, I don't know if I really have fibromyalgia." (DN 9-2 at 104.) Unlike in *Rogers*, the ALJ did not mischaracterize Gatti's testimony as to the scope of his daily activities. *See* 486 F.3d at 248. Additionally, unlike in *Rogers*, the ALJ explicitly noted that Gatti receives assistance from a housekeeper. *See id.* at 249.

Moreover, the ALJ's analysis of Gatti's credibility went beyond Gatti's ability to do household activities and the four-mile run three months before his alleged disability onset date. (DN 9-2 at 73 – 75.) First, the ALJ noted that Gatti's statements as to his pain were inconsistent with Dr. Robert Shefsky's findings in the consultative exam that Gatti had full range of motion of his spine and joints. (*Id.* at 74.) Second, the ALJ noted that though Gatti testified that he had

9

"very bad" hearing, there was little evidence in the record of hearing problems. (*Id.* at 107.) Third, the ALJ noted that the only side effect Gatti could identify from his medications was weight gain. (*Id.* at 106.) Fourth, the ALJ noted that Gatti did not explain how his GERD would prevent him from working. (*Id.* at 74.)

Therefore, substantial evidence supports the ALJ's finding that Gatti's testimony about the severity of his symptoms was not entirely credible.

Altogether, the Court will deny Gatti's motion for summary judgment.

## Order

The Court **DENIES** Gatti's motion for summary judgment (DN 12). The Court **AFFIRMS** the Commissioner's decision and **DISMISSES** this case, **with prejudice**.

cc: Counsel of record